UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



---

JAMES TANUI KIPTANUI,

        Petitioner,

    v.                                23-CV-672 (JLS)

JEFFREY SEARLS, in his official
capacity as Officer-in-Charge, Buffalo
Federal Detention Facility,

        Respondent.

---

## DECISION AND ORDER

Petitioner James Tanui Kiptanui, a native and citizen of Kenya, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the reasons that follow, the Court denies the relief requested and dismisses the petition.

## BACKGROUND

Petitioner entered the United States in 2004 as a refugee from Kenya. Dkt. 9 at 2; Dkt. 6-1 ¶ 5.[1] In the years following Petitioner's arrival in the United States, he encountered law enforcement numerous times. *See* Dkt. 6-1 ¶¶ 6-10; Dkt. 6-2 at 9-23. These encounters resulted in various arrests, convictions, and sentences. *See id.* On March 23, 2018, while Petitioner was in custody at Middlesex Correctional Facility, the U.S. Department of Homeland Security ("DHS") issued an immigration

---

[1] Unless otherwise noted, page references are to the numbers automatically generated by CM/ECF, which appear in the header of each page.

detainer as to Petitioner based on probable cause to believe that he is a removable alien. *See* Dkt. 6-1 ¶ 12; Dkt. 6-2 at 24. On February 28, 2019, U.S. Immigration and Customs Enforcement ("ICE") agents arrested Petitioner and took him into DHS custody. *See* Dkt. 9 at 4; Dkt. 6-1 ¶ 14.

## I.   OVERVIEW OF REMOVAL PROCEEDINGS

On or around May 24, 2018, DHS issued a Notice to Appear ("NTA") charging that, because Petitioner had been convicted of an aggravated felony (grand theft of a motor vehicle in violation of Ohio law), he is removable pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii). *See* Dkt. 6-2 at 25. Petitioner appeared before an Immigration Judge on April 22, 2019. Dkt. 9 at 8; Dkt. 6-1 ¶ 19. At that proceeding, the court sustained the charge of removability by clear and convincing evidence, found that Petitioner had been convicted of an aggravated felony, and designated Kenya as the country of removal. Dkt. 6-1 ¶ 19; Dkt. 6-2 at 31.

On August 1, 2019, an individual merits hearing commenced before the immigration court. Dkt. 6-1 ¶ 23. The hearing continued over three dates—August 1, September 18, and October 30. *Id.* ¶¶ 23-26. The court took the matter under advisement on October 30, 2019. *Id.* ¶ 26. On January 22, 2020, United States Immigration Judge John Furlong issued a decision denying various applications by Petitioner and ordering him "removed to Kenya." Dkt. 6-2 at 30-55.

On February 24, 2020, Petitioner appealed the removal order to the Board of Immigration Appeals ("BIA"). *See id.* at 56. On November 19, 2020, BIA dismissed Petitioner's appeal because Petitioner had not "properly" submitted "a brief on

appeal, despite indicating on the Notice of Appeal" that he intended to do so. *See id.* at 59.[2] On January 7, 2021, Petitioner contemporaneously filed with BIA (1) an emergency motion to stay removal; and (2) a motion to reopen his immigration proceedings. *See id.* at 64-70. BIA granted Petitioner's request to stay removal on January 12, 2021, *id.* at 72, and then denied Petitioner's request to reopen on August 10, 2021. *See id.* at 78.

On August 31, 2021, Petitioner filed a Petition for Review ("PFR") with the United States Court of Appeals for the First Circuit challenging BIA's August 10, 2021 decision. *See* Dkt. 6-1 ¶ 44; *Kiptanui v. Garland*, Court of Appeals Docket No. 21-1684 (1st Cir. 2021).[3] The Court entered a stay of removal on November 30, 2021. *See* 1st Cir. Dkt. 21-1684. On January 4, 2022, the respondent (Attorney General Merrick B. Garland) filed an unopposed motion to remand the matter to BIA for reevaluation of certain issues. *See id.* On January 26, 2022, the Court issued an order vacating the BIA decision "in relevant part" and remanding the matter for further proceedings "consistent with the government's remand request." *Id.* Under the January 26, 2022 order, the PFR would "remain pending" and be "held in abeyance pending further order." *Id.* In addition, the November 30, 2021 stay of removal would "remain in effect." *Id.* On February 8, 2022, BIA issued a

---

[2] Petitioner did submit a brief through counsel, but the brief was rejected as untimely. *See id.* at 57.

[3] The First Circuit docket in this matter is hereinafter cited as "1st Cir. Dkt. 21-1684."

notice acknowledging that the case had been remanded from the First Circuit.  Dkt.
6-2 at 82-83.

On September 1, 2022—following the First Circuit's remand order—BIA
ordered Petitioner's case "reopened" and directed that the "record" be "remanded to
the Immigration Judge for further adjudication and entry of a new decision." *Id.* at
89.[4]  Following several adjournments, a hearing for additional fact finding
commenced before an Immigration Judge on January 20, 2023.  Dkt. 6-1 ¶ 58.  The
hearing continued on February 9, 2023 and March 28, 2023.  *Id.* ¶¶ 58, 61.

At the March 28, 2023 proceeding, an issue was raised as to Petitioner's
mental competency.  *Id.* ¶ 61.  On or around September 21, 2023, a hearing took
place to determine whether Petitioner is competent to engage in removal
proceedings.  *See* Dkt. 11, 12.  The immigration court found petitioner to be
competent.  *See id.*  It also addressed the merits of Petitioner's removal but did not
issue a decision as to removal.  *Id.*  Both parties state that a written decision is
forthcoming.  *Id.*

## II.    PETITIONER'S CHALLENGE TO DETENTION IN DHS CUSTODY

On July 10, 2023, while the fact-finding proceeding before the immigration
court remained ongoing, Petitioner filed a petition with this Court challenging his
detention in DHS custody.  *See* Dkt. 1.

---

[4] Because BIA's September 1, 2022 order rendered its August 10, 2021 decision
nonfinal, the First Circuit dismissed the PFR.  *See* 1st Cir. Dkt. 21-1684.

Petitioner has been continuously detained in DHS custody since he was arrested by ICE agents on February 28, 2019. *See* Dkt. 6-4 at 3; Dkt. 9 at 2. Upon his arrest, a custody determination review was performed, and it was determined that Petitioner would be detained by DHS pending a final administrative determination in his case. *See* Dkt. 6-2 at 27. Petitioner requested that an immigration judge review this custody determination, *id.,* and a hearing was set for March 25, 2019. Dkt. 6-1 ¶ 16; Dkt. 9 at 7. The hearing was adjourned multiple times to afford Petitioner the opportunity to obtain counsel. Dkt. 6-1 ¶¶ 16-18; Dkt. 9 at 7-8. Then, at the April 22, 2019 proceeding—where the immigration court sustained the charge of removability—Petitioner did appear with an attorney. Dkt. 6-1 ¶ 19; Dkt. 9 at 8.[5] Both parties state that, at the April 22, 2019 proceeding, the immigration judge informed Petitioner that he may move for bond. *See* Dkt. 6-1 ¶ 19; Dkt. 9 at 8. But according to Petitioner, "no bond hearing was ever held" because "[n]o bond application was filed." Dkt. 9 at 8.

Respondent contends, however, that Petitioner was eventually granted a bond hearing after he moved for habeas relief in light of the COVID-19 pandemic. Dkt. 6-1 ¶ 29. That hearing allegedly took place on May 6, 2020. *Id.* ¶ 31.[6]

---

[5] According to Respondent, that attorney represented Petitioner on the issue of bond, but did not represent him for purposes of removal proceedings. *See* Dkt. 6-1 ¶ 19.

[6] The hearing was originally scheduled for April 28, 2020. But, according to Respondent, "it was adjourned because Petitioner's counsel was unaware of the hearing date and needed time to prepare." *Id.* ¶ 30.

Ultimately, the immigration court denied bond on the grounds that Petitioner presented a danger to the community that no alternatives to detention could ameliorate. *Id.* Later, DHS issued an additional Notice of Custody Determination on August 5, 2021, "[p]ursuant to a review conducted to comply with requirements in *Fraihat v. ICE*" because Petitioner had been identified as being "at heightened risk of severe illness and death upon contracting the COVID-19 virus." *See* Dkt. 6-2 at 77. Recognizing that Petitioner is a "noncitizen" who "has an aggravated felony conviction for grand theft (motor vehicle)," DHS recommended that Petitioner "remain in ICE custody." *Id.*

The record shows that Petitioner's custody status was reviewed numerous additional times between June 2020 and March 2022. On June 26, 2020, United States Immigration Judge Jennifer A. Mulcahy issued an order addressing a "[r]equest" for "a change in the custody status of [Petitioner] pursuant to 8 C.F.R 236.1(c)." *See* Dkt. 6-2 at 58.[7] After giving "full consideration" to the "representations" of both DHS and Petitioner, Judge Mulcahy denied Petitioner's request. *Id.* Then, on at least four occasions over the course of approximately one year, ICE issued a "Decision to Continue," informing Petitioner that his custody status had been reviewed and that he would not be released at that time. *See id.* at 73-77, 81, 84.[8] In each instance, ICE stated the reasoning for continued detention,

---

[7] It is unclear from the record when Petitioner made this request.

[8] It is unclear from the record whether these determinations were made at Petitioner's request.

and informed Petitioner that the decision was made based on a review of his file and consideration of "factors for consideration set forth at 8 C.F.R. § 241(e), (f), and (g)." *See id.*

Petitioner was transferred to the Buffalo Federal Detention Facility on March 15, 2023, where he is presently in custody. *See* Dkt. 6-1 ¶¶ 60, 65; Dkt. 9 at 2.[9] From the time that Petitioner was first taken into DHS custody (February 28, 2019) and now, approximately 56 months elapsed.[10]

On August 31, 2023, Respondent answered the petition and provided relevant supporting documents, including a memorandum of law and declarations with attached exhibits. Dkt. 6. Petitioner replied on September 15, 2023. Dkt. 9. The Court later received supplemental submissions from both parties. Dkt. 11, 12.

## ANALYSIS

Petitioner is detained under 8 U.S.C. § 1226(c), which requires detention of aliens convicted of certain crimes pending removal proceedings and does not afford a hearing at which the alien may advocate for release.[11] He argues that Section

---

[9] According to Respondent, Petitioner was previously detained at the Boston Federal Detention facility. *See* Dkt. 6-1 ¶ 60.

[10] The parties disagree as to the proper calculation of Petitioner's total time in detention for purposes of the instant claim. *See* Dkt. 1 (alleging that Petitioner has "been subject to mandatory immigration detention for approximately 46 months while [his] removal proceedings are pending"); Dkt. 6-4 at 11 (arguing that, because "the better start date to use in analyzing Petitioner's detention is November 30, 2021," Petitioner's "total time in detention" is "approximately 21 months").

[11] Section 1226(c) provides, in relevant part, that the "Attorney General shall take into custody any alien who . . . is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title." 8

1226(c), as applied to him, violates his Fifth Amendment procedural due process rights because it requires his continued detention, without a bond hearing, pending a final removal order. *See* Dkt. 1 at 3.

Petitioner seeks a writ of habeas corpus requiring Respondent to release him from custody or, in the alternative, "order a bond hearing" where Respondent "bears the burden" of proving by "clear and convincing evidence" that his "continued detention is necessary to prevent flight or danger to the community." *Id.* For the reasons discussed below, the petition is dismissed.

## I.     JURISDICTION

Habeas corpus review is available to persons who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Circuit courts have jurisdiction, to the exclusion of district courts, over challenges to the legality of final orders of deportation, exclusion, and removal. *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) ("[The REAL ID Act, 119 Stat. 231, § 106(a) (May 11, 2005)] eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . which circuit courts alone can consider."). District courts, however, can review claims by aliens challenging the constitutionality of their pre-removal detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003).

---

U.S.C. § 1226(c)(1)(B). There does not appear to be any dispute as to the statutory basis for Petitioner's current detention. *See* Dkt. 1 ¶ 19 (discussing Section 1226(c)); Dkt. 6-4 at 9 ("The parties do not dispute that Petitioner is detained pursuant to 8 U.S.C. § 1226(c)").

## II.   PETITIONER'S DUE PROCESS CLAIM

The Fifth Amendment provides that no person shall be (1) "deprived of," (2) "liberty," (3) "without due process of law."  U.S. Const. amend V.  In *Hodge v. Garland*, No. 23-CV-447 (JLS), 2023 WL 6856971, at *5-12 (W.D.N.Y. Oct. 18, 2023), this Court discussed in detail the legal principles that govern due process claims challenging detention under Section 1226(c).  Those principles apply equally in this case and are incorporated here.[12]

Petitioner claims that his detention is unconstitutional solely based on its duration.  *See* Dkt. 1 at 13 (alleging that Petitioner's "ongoing detention violates the Due Process Clause of the Fifth Amendment").[13]  But the record does not support that a due process violation has occurred.

Following his initial arrest on February 28, 2019, Petitioner has actively litigated whether he may remain in the United States.  He has invoked numerous layers of appellate review with respect to removal, including to BIA and the First Circuit Court of Appeals.  *See supra* page 3.  Petitioner's chosen litigation strategy inevitably has had the effect of prolonging his removal proceedings to some extent.  And there is no indication of delay attributable to the government.  As this Court

---

[12] A copy of *Hodge* is appended here as Exhibit A.

[13] Petitioner does not seek to avoid mandatory detention by demonstrating that he is not an alien, that he was not convicted of the predicate crime, or that the agency is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention.  Relief, therefore, is not warranted on such grounds.  *See Demore v. Kim*, 538 U.S. 510, 514 n.3 (2003) (a "*Joseph* hearing" is "immediately provided to a detainee who claims that he is not covered by § 1226(c)").

recognized in *Hodge*, Petitioner "may avail himself of all 'process' available to him in his removal proceedings." *Hodge*, 2023 WL 6856971, at *10. But he "cannot expect resulting delay in his removal proceedings to bolster his due process claim." *Id.*

Like the petitioner in *Hodge,* Petitioner may elect to regain his liberty by agreeing to return to his native country. Because he "holds the keys to release," there is no governmental deprivation of any liberty interest. *See id.* at *10. Even if a governmental deprivation existed here, the amount of process due to Petitioner "is the amount provided for by Congress." *See id.* at *11. And Petitioner has availed himself of such process throughout his removal proceedings by, for example, seeking periodic review of his custody status. *See supra* page 6. In sum, Petitioner's detention comports with the Fifth Amendment. *See Hodge*, 2023 WL 6856971, at *11.

## CONCLUSION

For these reasons, the relief requested is denied and the petition is dismissed. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:        November 8, 2023
              Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

OSVALDO HODGE,

                Petitioner,

        v.                                                    23-CV-447 (JLS)

MERRICK GARLAND, in his official
capacity as Attorney General, U.S.
Department of Justice,

ALEJANDRO MAYORKAS, in his
official capacity as Secretary, U.S.
Department of Homeland Security,

THOMAS BROPHY, in his official
capacity as Acting Field Office Director,
Buffalo Field Office, U.S. Immigration
and Customs Enforcement,

JEFFREY SEARLS, in his official
capacity as Officer-in-Charge, Buffalo
Federal Detention Facility,

                Respondents.

_____

## DECISION AND ORDER

This case presents the question whether the Fifth Amendment's Due Process

Clause is violated where the government, without any intentional delay, frivolous

litigation, or arbitrary confinement, detains a criminal alien pursuant to the

mandatory detention provision in 8 U.S.C. § 1226(c), for two years, while the alien

actively litigates whether he may remain in the United States, thereby lengthening

the duration of his detention—all while he retains the keys to his liberty if he were

to agree to removal to his native country.  This issue goes to the core of congressional power over immigration issues and national sovereignty.  Supreme Court and Second Circuit authority indicate no constitutional violation—and no right to a bond hearing—on these facts, where an alien seeks release into the United States for the duration of his removal proceedings.

For these reasons, and those that follow, the Court denies the relief requested and dismisses the petition.

## BACKGROUND

### I.  Overview

Petitioner Osvaldo Hodge is a native and citizen of the Dominican Republic.  He entered the United States in August 1990.  Hodge has been detained at the Buffalo Federal Detention Facility pending removal proceedings for approximately twenty-five months.  He petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.

Hodge currently is detained under 8 U.S.C. § 1226(c), which requires detention of aliens convicted of certain crimes pending removal proceedings and does not afford a hearing at which the alien may advocate for release.  He argues that Section 1226(c), as applied to him, violates his Fifth Amendment procedural due process rights because it requires his continued detention, without a bond hearing, pending a final removal order.

Hodge seeks a conditional writ of habeas corpus "requiring Respondents to provide [him] with a constitutionally adequate, individualized hearing before an

2

impartial adjudicator at which Respondents bear the burden of establishing by clear and convincing evidence that [he] is a danger to the community or a flight risk" such that "no alternatives to detention could reasonably secure his future compliance with the orders of immigration officials." Dkt. 8, at 22 ¶ 2.[1]  He also seeks an award of his costs and attorneys' fees pursuant to 28 U.S.C. § 2412. *Id.* at 22 ¶ 3.

## II.   <u>Immigration History, Criminal History, and Detention[2]</u>

In 1990, Hodge entered the United States in Puerto Rico as a lawful permanent resident.  Dkt. 12, at 2 ¶ 3; Dkt. 12-1. at 2 ¶ 5.  He has lived in the United States since that time, with the exception of one brief trip to the Dominican Republic in 1999 to visit family.  Dkt. 8, at 6 ¶ 26.

### A.    First Set of Immigration Proceedings & Related Convictions

Hodge first was arrested in 1999 by the East Haven Police Department for selling a synthetic narcotic and was prosecuted in Connecticut Superior Court.  Dkt. 12-1, at 2 ¶ 6; Dkt. 12-2, at 4.  In February 2001, he was sentenced to six months in jail (execution suspended), with two years of probation, based on that arrest.  Dkt. 12-2, at 4.  On February 20, 2004, Hodge was issued a Notice to Appear for removal proceedings based on his 2001 controlled substances-related conviction, which made him removable under Section 212(a)(2)(C) of the Immigration and Nationality Act

---

[1] All page references are to the pagination automatically generated by CM/ECF, which appears in the header of each page.

[2] The parties' accounts of these events vary in detail but agree on the basic timeline set forth below.

("INA"). *Id.* at 6–8; Dkt. 12-1, at 2 ¶ 7.  He was ordered detained pending removal proceedings and requested a redetermination of that decision by an immigration judge on the same date.  Dkt. 12-2, at 9.  In March 2004, the immigration judge concluded that the immigration court did not have jurisdiction over Hodge's custody redetermination request. *Id.* at 10; Dkt. 12-1, at 3 ¶ 9.  Also in March 2004, Hodge additionally became removable under INA Section 212(a)(2)(A)(i)(II).  Dkt. 12-1, at 3 ¶ 10; Dkt. 12-2, at 11.

Under circumstances that are unclear, at some point, Hodge was released from immigration detention.  Dkt. 12, at 2 ¶ 7.  In December 2004, he was arrested for criminal trespass, interference with an emergency call, and failure to appear, for which he was convicted and sentenced to one year of imprisonment (execution suspended), with a one-year conditional discharge.  Dkt. 12-1, at 3 ¶ 11; Dkt. 12-2, at 4.

In May 2006, Hodge was arrested for cocaine possession.  Dkt. 12-1, at 3 ¶ 12; Dkt. 12-2, at 2.  He was convicted and sentenced to one year of imprisonment (execution suspended), with a one-year conditional discharge.  Dkt. 12-1, at 3 ¶ 12; Dkt. 12-2, at 4, 12–13.

In January 2007, Hodge was arrested for burglary.  Dkt. 12-1, at 3 ¶ 13; Dkt. 12-2, at 4, 14–15.  In April 2007, he was arrested for failure to appear.  Dkt. 12-1, at 3 ¶ 14; Dkt. 12-2, at 2, 4.  He was convicted of both offenses and sentenced to three years of imprisonment (execution suspended), with three years of probation.  Dkt. 12-2, at 4, 14.

4

Hodge then was arrested for heroin possession in April 2012. Dkt. 12-1, at 3 ¶ 15; Dkt. 12-2, at 4. He was sentenced to three years of imprisonment (execution suspended), with a two-year conditional discharge. Dkt. 12-1, at 3 ¶ 15; Dkt. 12-2, at 4, 17–18.

In September 2015, Hodge was encountered in Connecticut state court, identified, and informed that immigration authorities had a warrant to take him into immigration custody. Dkt. 12-1, at 4 ¶¶ 17, 18; Dkt. 12-2, at 20. He was taken to the Hartford Enforcement and Removal and Operations Office and received another Notice to Appear. Dkt. 12-1, at 4 ¶ 18. That Notice to Appear stated that Hodge was subject to removal under Section 237(a)(2)(B)(i) of the INA, based on his 2007 and 2012 convictions in Connecticut for possession of narcotics. Dkt. 12-2, at 23.[3] A September 14, 2015 Notice of Custody Determination stated that the Department of Homeland Security ("DHS") was detaining Hodge pending removal proceedings. *Id.* at 25. Hodge requested review of this custody determination by an immigration judge. *Id.*

On November 17, 2015, Immigration Judge Michael W. Straus denied Hodge's application for cancellation of removal for permanent residents and ordered him removed to the Dominican Republic. *Id.* at 38; *see also* Dkt. 12-1, at 4 ¶ 20. Hodge appealed both the September 2015 denial of bond and the November 2015 order of removal. Dkt. 12-1, at 4 ¶ 21; Dkt. 12-2, at 40–43. The appeal was

---

[3] These convictions appear to be based on Hodge's May 2006 arrest for cocaine possession and his April 2012 arrest for heroin possession. *See id.*

dismissed as untimely. Dkt. 12-1, at 5 ¶ 22. An immigration judge granted Hodge's request and released him on a $30,000 bond in February 2016.[4] Dkt. 12-2, at 45–46; *see also* Dkt. 12-1, at 5 ¶ 23.

The Board of Immigration Appeals ("BIA") set a briefing schedule on Hodge's appeal of his removal order. Dkt. 12-2, at 47. Hodge requested, and received, an extension of time to file his brief. *Id.* at 48. On December 23, 2016, the BIA remanded Hodge's record to the immigration judge for further proceedings, in part because DHS did not oppose the appeal or respond to Hodge's remand request and in part because of a claimed error in the immigration judge's conclusion regarding the nature of Hodge's burglary conviction. *Id.* at 49–50. On November 27, 2018, Immigration Judge Straus granted Hodge's application for cancellation of removal. *Id.* at 51–52; *see also* Dkt. 12-1, at 5 ¶ 27.

### B.   Current Immigration Proceedings & Related Conviction

In May 2019, the Drug Enforcement Administration arrested Hodge for criminal conduct related to heroin and cocaine trafficking. Dkt. 12-2, at 54. Hodge pled guilty to, and was convicted of, conspiracy to possess with intent to distribute, and to distribute, heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. *Id.* at 57. On October 1, 2020, he was sentenced to twelve months and one day of imprisonment, plus three years of supervised release. *Id.* at 57–58; *see also* Dkt. 12-1, at 5 ¶ 29.

---

[4] The order releasing Hodge on bond is dated September 23, 2015, Dkt. 12-2, at 45, but the bond is dated February 17, 2016, *id.* at 46.

6

A Warrant for Arrest of Alien, dated November 12, 2020, concluded that probable cause existed to believe that Hodge was removable from the United States. Dkt. 12-2, at 61. As a result, DHS issued an immigration detainer. *Id.* at 62. On August 17, 2021, DHS cancelled Hodge's immigration bond. *Id.* at 63–64.

Hodge received another Notice to Appear on September 10, 2021. *Id.* at 65–66; *see also* Dkt. 12-1, at 6 ¶ 33. This notice stated that Hodge was removable from the United States under Sections 237(a)(2)(B)(i) and (a)(2)(A)(iii) of the INA as a result of his federal conviction for conspiracy to possess with intent to distribute, and to distribute, heroin and cocaine. Dkt. 12-1, at 6 ¶ 33; Dkt. 12-2, at 65–68. A Notice of Custody Determination dated September 10, 2021 ordered Hodge detained. Dkt. 12-2, at 69. Hodge was taken into immigration custody the same date. Dkt. 12-1, at 6 ¶ 32. He asked an immigration judge to review his custody determination. Dkt. 12-2, at 69. Immigration Judge Robert Driscoll denied Hodge's custody redetermination request on September 28, 2021, because detention was mandatory based on Hodge's aggravated felony and controlled substances conviction, as well as because he was a drug user or addict. *Id.* at 70; *see also* Dkt. 12-1, at 7 ¶ 35.

Hodge's removal hearing was adjourned twice to accommodate his attorney. Dkt. 12-1, at 7 ¶¶ 35, 36. He appeared with his attorney for a removal hearing on October 12, 2021, and the hearing was rescheduled to October 19, 2021. *Id.* ¶ 37. On October 19, 2021, Hodge's attorney stated that Hodge planned to apply for asylum and, as a result, his hearing was rescheduled to November 9, 2021. *Id.* ¶ 38.

7

Hodge applied for asylum on November 2, 2021, and his removal hearing was adjourned again—this time to December 15, 2021—to allow for adjudication of his asylum application and the issue of removal. *Id.* ¶ 39.

Hodge moved to adjourn the December 15, 2021 hearing because he was under quarantine for COVID-19. *Id.* ¶¶ 41, 42. Hodge moved to adjourn the hearing again—this time from January 21, 2022—because he was under quarantine for COVID-19. *Id.* ¶ 43. The hearing ultimately occurred on January 28, 2022, and Immigration Judge Driscoll denied Hodge's applications for (1) asylum, (2) withholding of removal, (3) withholding under the Convention Against Torture ("CAT"), and (4) deferral under the CAT. *Id.* ¶ 44; *see also* Dkt. 12-2, at 72–84. Hodge appealed to the BIA, which remanded the matter to the immigration judge on September 6, 2022, for further proceedings. Dkt. 12-1, at 8 ¶¶ 45, 46.

An appearance scheduled for November 8, 2022 was rescheduled to December 12, 2022, for a competency hearing. *Id.* at 8 ¶ 47. On December 12, 2022, an immigration judge found Hodge competent to appear in his removal proceedings and rescheduled the matter for a hearing on January 5, 2023. *Id.* ¶ 48. The removal hearing began on January 5, 2023, and was continued to January 26, 2023, for additional testimony. *Id.* ¶ 49.

On February 2, 2023, Immigration Judge Driscoll ordered Hodge removed. *Id.* ¶ 49; *see also* Dkt. 12-2, at 88–97. Hodge appealed his removal order to the BIA on March 2, 2023. Dkt. 12-1, at 8 ¶ 51; Dkt. 12-2, at 87. On July 27, 2023, the BIA remanded the matter to the immigration judge, instructing him to "reassess

8

[Hodge]'s claim for protection under the CAT considering the record as a whole," and to conduct further factfinding regarding Hodge's claims. Dkt. 12-2, at 100–02; *see also* Dkt. 12-1, at 8 ¶ 52.

### III.   Mental-Health & Substance-Abuse Conditions

Hodge lives with various diagnosed mental-health conditions. Dkt. 8, at 7 ¶ 27.[5]  He also has abused alcohol and drugs. Dkt. 8, at 7 ¶ 27.  He receives treatment for his mental-health and substance-abuse conditions and is prescribed medication. *Id.*

Hodge alleges that, while confined at the Buffalo Federal Detention Facility between October 2021 and June 2023, he met with a mental-health professional three times for no more than fifteen minutes per session. *Id.* at 9 ¶ 38.  He also alleges that he repeatedly requested changes to his medication because his current regimen was not sufficient to manage his mental-health conditions. *Id.*[6]

### IV.   Procedural History

Hodge filed his initial petition on May 19, 2023. Dkt. 1.  Before Respondents answered or responded, the parties agreed to a briefing schedule, which included time for Hodge to file an amended petition. Dkt. 4.  Hodge filed his amended petition—the operative petition here—on June 16, 2023. Dkt. 8.  He also submitted

---

[5] These mental-health conditions—and the treatment Hodge receives for them— form the general basis for his application under the CAT. *See* Dkt. 8-3, at 4–35; Dkt. 12-2, at 100–02.

[6] Hodge confirmed that he is not challenging the conditions of his confinement in this petition. *See* Dkt. 13, at 5.

9

a sealed document regarding his mental-health and substance-abuse history in support of the amended petition. Dkt. 11. On July 31, 2023, Respondents answered the amended petition and provided relevant supporting documents, including a memorandum of law and declarations with attached exhibits. Dkt. 12. Hodge replied on August 15, 2023. Dkt. 13. On September 14, 2023, the Court heard oral argument on the relief requested in the amended petition and reserved decision. Dkt. 17.

Hodge's Section 1226(c) detention, which began on September 10, 2021,[7] has lasted approximately twenty-five months to date. Dkt. 12, at 4 ¶ 24.

## ANALYSIS

## I.   Jurisdiction

Jurisdiction over substantive challenges to final deportation, exclusion, and removal orders resides with the circuit courts; district courts lack jurisdiction over the merits of such orders. *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) (holding that the REAL ID Act "eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . , which circuit courts alone can consider"). But district courts can review claims that pre-removal detention is unconstitutional. *See Demore v. Kim*, 538 U.S. 510, 516–

---

[7] Respondents state that Hodge's immigration detention began on September 10, 2021. *See, e.g.*, Dkt. 12, at 4 ¶ 24. Hodge alleges that he entered immigration custody in October 2021. Dkt. 8, at 2 ¶ 2. The Court will use the earlier, September 10, 2021 date when analyzing Hodge's claims in the amended petition. Hodge currently is in custody at the Buffalo Federal Detention Facility in Batavia, New York, pending removal proceedings. Dkt. 12-1, at 9 ¶ 53.

10

17 (2003). In this way, habeas corpus review is available to persons "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241(c)(3).

Hodge claims that his detention is unconstitutional based on its duration. Specifically, he claims that his now twenty-five-month detention under Section 1226(c) without an individualized bond hearing, in which the government bears the burden of proof, violates his procedural due process rights under the Fifth Amendment. *See, e.g.*, Dkt. 8, at 3 ¶ 6; *id.* at 10 ¶¶ 42, 43; *id.* at 21–22 ¶¶ 70–76. Respondents do not dispute that the Court has jurisdiction over Hodge's "challenge to his continued detention." Dkt. 12, at 2 ¶ 1. The parties agree that Hodge is detained pursuant to Section 1226(c). *See, e.g.*, Dkt. 8, at 2 ¶ 3; *id.* at 5 ¶ 20; Dkt. 12, at 4 ¶ 26.

## II.   Constitutionality of Section 1226(c)

### A.   Governing Principles

The Fifth Amendment provides that no person shall be (1) "deprived of," (2) "liberty," (3) "without due process of law." U.S. Const. amend V. It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 523 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)) (internal quotation marks omitted). But the Supreme Court has also recognized that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Id.* Indeed, "deportation proceedings 'would be in vain if those accused could not be held in custody pending

11

the inquiry into their true character.'" *Id.* (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)); *see also Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting) ("Congress' power to detain aliens in connection with removal or exclusion . . . is part of the Legislature's considerable authority over immigration matters.").

Equally clear are the "constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine the safeguards necessary to ensure that a petitioner receives "the opportunity to be heard at a meaningful time and in a meaningful manner," the Court considers: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of [that] interest through the procedures used, and the probable value, if any, of additional procedural safeguards;" and (3) the [g]overnment's interest, including the function involved and the . . . burdens that [any other] procedural requirement would impose." *Id.* at 333, 335 (internal quotation marks and citation omitted).

Hodge's detention is mandatory under 8 U.S.C. § 1226(c), which provides that the Attorney General "shall take into custody any alien who . . . is deportable by reason of having committed" certain criminal offenses[8] —including, as relevant

---

[8] By contrast, under Section 1226(a), the Attorney General "may continue to detain the arrested alien" and "may release the alien on . . . bond . . . or conditional parole" pending a "decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).

here, (1) an aggravated felony at any time after admission, and (2) under federal controlled substances law other than an offense involving possession of a small amount of marijuana for personal use. *See* 8 U.S.C. § 1226(c)(1)(B);[9] 8 U.S.C. §§ 1227(a)(2)(A)(iii), (a)(2)(B)(i); *see also* Dkt. 12-2, at 70.

The Supreme Court rejected a constitutional challenge to Section 1226(c) in *Demore v. Kim*, where it held: "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that [such] persons . . . be detained for the brief period necessary for their removal proceedings." 538 U.S. at 513. The Court alternatively used the phrase "limited period necessary for . . . removal proceedings," *id.* at 526, and contrasted the "shorter" Section 1226(c) period with the "indefinite" and "potentially permanent" type of detention addressed in *Zadvydas*, 533 U.S. at 690–91. *Demore*, 538 U.S. at 528. It concluded that no constitutional violation resulted from detention of the alien at issue "for the limited period of his removal proceedings." *Id.* at 531.

_____

[9] If an alien meets these criteria, the Attorney General may order release "only if:" (1) release is necessary for certain witness-protection purposes; and (2) the alien "will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2); *see also Jennings v. Rodriguez*, 538 U.S. — , 138 S. Ct. 830, 837–38 (2018) (explaining that "Section 1226(c) . . . carves out a statutory category of aliens who may *not* be released under § 1226(a)" and summarizing Section 1226(c)'s detention and release requirements (emphasis in original)). The Attorney General also must consider the severity of the criminal offense. *See* 8 U.S.C. § 1226(c)(2).

13

Nothing in *Demore* mandates any specific form of brevity; nor does *Demore* define that term. Instead, the *Demore* Court recognized that detention pending a determination of removability has a "definite termination point." *Id.* at 529. In particular, where a petitioner appeals the immigration judge's decision to the BIA, such detention ends with a BIA determination and, if applicable, a final order of removal. *See, e.g., id.* Delays attributable to a petitioner may permissibly extend the termination point. *See id.* at 530 (identifying delay in petitioner's request for a continuance of his removal hearing); *id.* at 531 n.14 (where petitioner argued that "the length of detention required to appeal may deter aliens from exercising their right to do so," concluding that "the legal system . . . is replete with situations requiring the making of difficult judgments as to which course to follow, and, even in the criminal context, there is no constitutional prohibition against requiring parties to make such choices" (internal quotation marks and citations omitted)).

*Demore* also reiterated the "fundamental premise of immigration law" that, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 521 (quoting *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976)) (internal quotation marks omitted).

As the *Demore* Court noted, "the statutory provision at issue govern[ed] detention of deportable criminal aliens *pending their removal proceedings*." *Id.* at 527–28 (emphasis in original). Detention in this circumstance "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during

14

their removal proceedings, thus increasing the chance that, if ordered removed, [they] will be successfully removed." *Id.* at 528.

Regardless of whether individualized bond hearings would be effective to achieve the aim of ensuring successful removal, when adopting Section 1226(c), Congress had before it "evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.*[10] And "when the [g]overnment deals with deportable aliens," that was enough because "the Due Process Clause does not require [the government] to employ the least burdensome means to accomplish its goal." *Id.* As a result, the *Demore* Court concluded that the "evidence Congress had before it . . . support[ed] the approach it selected even if other, hypothetical studies might have suggested different courses of action." *Id.* In sum, detention during removal proceedings "is a constitutionally permissible part of that process." *Id.* at 531.

The Court's holding in *Demore* aligns with its prior recognition that "the responsibility for regulating the relationship between the United States and [its] alien visitors [is] committed to the political branches of the Federal Government." *Diaz*, 426 U.S. at 81. Indeed, "[o]ver no conceivable subject is the legislative power of Congress more complete." *Flores*, 507 U.S. at 305 (internal quotation marks and citations omitted). Because decisions regarding immigration "may implicate [the

---

[10] In other words, when Congress enacted Section 1226, "individualized bail determinations had not been tested under optimal conditions. or tested in all their possible permutations." *Id.*

United States'] relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently . . . more appropriate [for] either the Legislature or the Executive than [for] the Judiciary." *Diaz*, 426 U.S. at 81; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) (citing *Diaz*, 426 U.S. at 81) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

Indeed, imagine a scenario where the number of aliens surges, increasing the volume of removal proceedings involving criminal aliens and, thereby, slowing the pace at which those proceedings move. Lenient application of multi-factor tests (discussed below) results in bond hearings and, presumably, in some cases, released detainees. Such a scenario arrogates this very sovereignty issue to the judiciary— and to the aliens themselves by virtue of their chosen litigation strategy. The Constitution does not require that outcome, and the statute prohibits it.[11]

As a result of these broad concerns, the Supreme Court has "underscore[d] the limited scope of judicial inquiry" into issues related to immigration legislation. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The power over matters related to "aliens is of a political character and therefore subject only to narrow judicial review." *Id.* (citation omitted). In particular:

---

[11] To be sure, Congress retains the power to amend the statutory prohibition by amending Section 1226(c).

16

> [A]ny policy toward aliens is vitally and intricately interwoven with
> contemporaneous policies in regard to the conduct of foreign relations,
> the war power, and the maintenance of a republican form of
> government. Such matters are so exclusively entrusted to the
> political branches of government as to be largely immune from
> judicial inquiry or interference.

*Diaz*, 426 U.S. at 81 n.17 (internal quotation marks and citations omitted).

Against this careful backdrop, courts must pay particular attention to the

constitutional interests, governance concerns, and individual rights involved in

these weighty questions. Indeed, courts must employ "a narrow standard of review

of decisions made by the Congress or the President" regarding immigration and

must exercise "the greatest caution" in evaluating constitutional claims that

implicate those decisions. *See id.* at 81–82.

In addition, *Demore* highlighted the "process" that has been built into the

mandatory detention provision in Section 1226(c). For example, Section 1226(c)

applies to detainees whose convictions generally were "obtained following the full

procedural protections [the] criminal justice system offers." *See Demore*, 538 U.S. at

513; *id.* at 525 n.9 (noting that "respondent became 'deportable' under [Section]

1226(c) only following criminal convictions that were secured following full

procedural protections"); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 & n.7 (2d Cir.

2020) (noting a "sharp contrast" between procedural protections afforded to criminal

defendants later detained under Section 1226(c) and those afforded to Section

1226(a) detainees).

Finally, an expedited hearing—a *Joseph* hearing—is available to detainees

who claim they are not subject to Section 1226(c). At a *Joseph* hearing, "the

17

detainee may avoid mandatory detention by demonstrating that he is not an alien, [that he] was not convicted of the predicate crime, or that the [agency] is otherwise substantially unlikely to establish that he is in fact subject to mandatory detention." *Demore*, 538 U.S. at 514 n.3 (citing 8 C.F.R. § 3.19(h)(2)(ii) (2002), and *Matter of Joseph*, 22 I. & N. Dec. 799, 1999 WL 339053 (BIA 1999)).[12]

### B.    Section 1226(c) Detention in Lower Courts

Since *Jennings v. Rodriguez*, the Second Circuit "has not addressed . . . the standard to be utilized by courts in addressing procedural due process claims for aliens detained pursuant to [Section] 1226(c) in the immigrant habeas context." *Ranchinskiy v. Barr*, 422 F. Supp. 3d 789, 796–97 (W.D.N.Y. 2019). When determining whether the petitioner's "length of detention has become unreasonable or unjustified," district courts within the Second Circuit have considered factors such as:

> (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes

---

[12] In his concurrence, Justice Kennedy suggested that, because the Due Process Clause prohibits "arbitrary" deprivations of liberty, a detainee "could be entitled to an individualized determination as to his [or her] risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Demore*, 538 U.S. at 532 (Kennedy, J., concurring). For instance, an "unreasonable delay by the [government] in pursuing and completing deportation proceedings" may suggest that detention is being used "not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532–33. That analysis would depend on "the circumstances of [the] case." *Id.* at 533.

committed by the petitioner; and (7) whether the petitioner's detention is near conclusion.

*Id.* at 797 (citation omitted). If this analysis reveals that the detention is not unreasonably prolonged, district courts have concluded that no procedural due process violation exists and have ended the analysis. *See, e.g., Kabba v. Barr*, 403 F. Supp. 3d 180, 185 (W.D.N.Y. 2019). But when district courts have concluded that an alien's detention is unreasonably prolonged, they next have considered what process petitioner is due—in other words, whether the government has "provided the procedural safeguards required by the Due Process Clause." *Id.*

The collection of resulting outcomes in these recent district court cases turns significantly on the duration of detention and much less on the petitioner's litigation regarding removal as the reason for the duration. The outcomes turn even less on the reality that petitioners exercise control over the length of detention, by retaining the ability to consent to release to their native countries pending removal proceedings—thereby holding the "keys" to their own release.

The factor-driven process used in recent district court decisions should be considered in light of the Second Circuit's decision in *Doherty v. Thornburgh*, 943 F.2d 204 (2d Cir. 1991), which parallels the principles the Supreme Court would later discuss in *Demore*. The *Doherty* court recognized that "an alien's right to be at liberty during the course of deportation proceedings is circumscribed by considerations of national interest." *Id.* at 209. Control "over matters of immigration and naturalization is the 'inherent and unalienable right of every sovereign and independent nation,'" and the Constitution vests this control "in the

19

political branches of government." *Id.* (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893)).  The power of Congress in such matters "is plenary, subject to only limited judicial review."  *Id.*

Detention of the petitioner in *Doherty* was "not an end in itself sought by the Attorney General; rather bail [was] denied . . . to preserve the government's ability to later carry out its broader responsibility over immigration matters."  *Id.* at 211. Examining the causes for the length of detention, the court recognized that, over the course of years, the petitioner "exercised skillfully his rights under the deportation statute"—a "perfectly permissible" litigation strategy, but one that the petitioner could "not rely on the extra time resulting therefrom" to obtain habeas relief based on the duration of his detention.  *Id.*  *Doherty* does not foreclose the possibility that "lengthy detention largely the result of a government strategy intended to delay" might result in a substantive due process violation.  *Id.*

Because the *Doherty* petitioner's detention resulted from his challenge to removal, "from the outset of his detention, [he had] possessed, in effect, the key that unlocks his prison cell."[13]  *Id.* at 212.  His choice to contest vigorously his deportation properly subjected him "to the countervailing measures Congress . . . enacted to ensure the protection of national interests."  *Id.*  The Fifth Amendment guaranteed the petitioner "adequate procedural safeguards during the course of the deportation proceedings," as well as liberty pending deportation "absent a proper

---

[13] It could not "be said that, by attributing to [the petitioner] primary responsibility for the delay in resolving his status, he [was] being 'punished' for the exercise of his constitutional rights."  *Id.*

20

exercise of statutory discretion by the Attorney General." *Id.* But the Fifth Amendment did not confer a "substantive due process right not to be deported." *Id.* (internal quotation marks and citation omitted). Because the petitioner had "been afforded the full panoply of procedural due process" and had "not demonstrated the invidious purpose, bad faith[,] or arbitrariness necessary to make out a denial of substantive due process," his detention did not offend the Constitution. *Id.*

Other cases—from within and outside of this Circuit—are instructive. One such case, *Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999), illustrates the circuit split regarding the constitutionality of Section 1226(c), which led to *Demore*.[14] In *Parra*, the Seventh Circuit recognized that a petitioner subject to Section 1226(c) "can withdraw his [or her] defense of the removal proceeding and return to his [or her] native land," ending detention. *Parra*, 172 F.3d at 958. Such a petitioner "has the keys [to release] in his [or her] pocket." *Id.* A petitioner subject to Section 1226(c) "has no constitutional right to remain at large during the ensuing delay [in his or her removal proceedings], and the United States has a powerful interest in maintaining the detention . . . to ensure that removal actually occurs." *Id.*

The *Parra* court engaged in the "due process calculus under *Mathews v. Eldridge*" under the facts and circumstances presented and concluded that, in light of "the sweeping powers Congress possesses to prescribe the treatment of aliens," Section 1226(c) is constitutional. *Parra*, 172 F.3d at 958; *see also id.* ("Section 1226(c) plainly is within the power of Congress."). That court left open the

---

[14] *See Demore*, 538 U.S. at 516.

21

possibility that habeas relief "may be appropriate" in cases involving "claims by persons detained under [Section] 1226(c) who say that they are citizens rather than aliens, who contend they have not been convicted of one of the felonies that authorizes removal, or who are detained indefinitely because the nations of which they are citizens will not take them back." *Id.* at 957. But such facts were not presented to that court.

In *Yanez v. Holder*, 149 F. Supp. 2d 485 (N.D. Ill. 2001), the court considered challenges from Section 1226(c) petitioners who were challenging removal. *See id.* at 491, 492. The court "[w]eigh[ed] the[] factors" in *Mathews v. Eldridge*, noting: (1) the petitioners had a "strong liberty interest" to "be free from . . . possibly long-term detention," in light of their ongoing challenges to removal; (2) there was "little probability of error because the petitioners [did] not dispute their convictions;" and (3) the government had "a substantial interest in ensuring the presence of criminal aliens who have obvious motivation to flee during the removal process." *Id.* at 493– 94. In light of those factors, and "given the broad powers Congress possesses to prescribe the treatment of aliens," the court concluded that "den[ying] . . . an individualized bond hearing to petitioners who have been found to be criminal aliens detained pursuant to [Section 1226(c)] is not a violation of procedural due process." *Id.* at 494.

Another court in this district determined that more than three years of detention pursuant to Section 1226(c) did not violate the Due Process Clause. *See Luna-Aponte v. Holder*, 743 F. Supp. 2d 189, 197 (W.D.N.Y. 2010). Citing *Demore*,

22

the court concluded that the petitioner did not show his continued detention was "unreasonable or unjustified." *Id.* For example, no delay in removal proceedings was attributable to the government. *See id.* at 199. Moreover, if the petitioner were unsuccessful in removal proceedings, there was "absolutely no impediment to [his] eventual deportation" and "nothing preventing him from being removed" to his native country. *Id.* at 197. Because the petitioner could "obtain his release to [his native country] at any time," he was "essentially remaining in custody voluntarily, rather than returning to [his native country] and awaiting the outcome of his [removal proceedings] there." *Id.* at 199. The court noted that the petitioner's preference to remain in custody in the United States instead of release to his native country suggested that the petitioner might be unwilling to comply with removal, if necessary. *Id.* at 200. Detention under those circumstances did not violate the Due Process Clause. *See id.* at 199–200.

Finally, this Court has determined that a twenty-seven-month period of detention pursuant to Section 1226(c) did not offend the Due Process Clause. *See Sosa Rodriguez v. Feeley*, 507 F. Supp. 3d 466, 479 (W.D.N.Y. 2020). The Court recognized that the length of detention was significant but, on the other hand, no barriers to removal existed aside from the petitioner's challenge to removal. *See id.* Some of delay in the removal proceedings was attributable to the petitioner's litigation strategy—which the petitioner was entitled to pursue, but which did not bolster his due process claim. *See id.* at 480. The petitioner's due process claim also "fail[ed] under the narrow test proposed in Justice Kennedy's *Demore* concurrence"

23

because the circumstances of his "detention [did] not support an inference that his detention [was] arbitrary, unreasonable, or unjustified." *Id.* (citing *Demore*, 538 U.S. at 532). In other words, there were "no facts suggesting that DHS [sought] to detain [the petitioner] for 'other reasons' beyond facilitating deportation or protecting against risk of flight or dangerousness." *Id.* (quoting *Demore*, 583 U.S. at 532–33 (Kennedy, J., concurring)). Under those circumstances, the petitioner's continued detention did not violate his procedural due process rights. *See id.* at 481.

## C. Hodge's Detention Comports with the Fifth Amendment

Hodge challenges his continued detention on procedural due process grounds, arguing that his now twenty-five-month detention has become unreasonably prolonged, and that Respondents must provide an individualized bond hearing, in which the government bears the burden of proof. The Supreme Court's holding and rationale in *Demore*, supplemented by the authority discussed in detail above, provide the structure for this Court's analysis of Hodge's Section 1226(c) detention here. Based on this framework, Hodge's detention has not violated his due process rights.

The government is not seeking to retain custody of removable aliens under Section 1226(c). Rather, by following the statute's mandatory-detention provision, the government seeks to promote public safety within this country and to ensure a means of effecting potential eventual removal. During the pendency of removal proceedings, an alien subject to Section 1226(c) may elect to regain his or her liberty—or freedom from detention—by agreeing to return to his or her native

24

country. The quasi-voluntary nature of the detention undermines any due process claim. Because detention is quasi-voluntary and the alien holds the keys to release, there is no governmental deprivation. And as the Supreme Court in *Demore*—and other courts elsewhere—recognized, an alien has no statutory or constitutional right to release during the finite period of removal proceedings. The Court is aware of no Supreme Court or Second Circuit case requiring release—or a bond hearing— during the pendency of removal proceedings in the Section 1226(c) context.

The length of Hodge's detention is indeed significant. The Court acknowledges that Hodge's removal proceedings are ongoing—and, perhaps, may continue for several more months. Ultimately, the length of Hodge's detention is a product of his chosen course of litigation in his removal proceedings. Hodge, of course, may avail himself of all "process" available to him in his removal proceedings—including requesting extensions of time, adding claims or bases for relief from removal, and appealing all adverse decisions. But he cannot expect resulting delay in his removal proceedings to bolster his due process claim. If a petitioner could delay enough and thereby earn release, he could defeat the process. *See Demore*, 538 U.S. at 531 n.14 (concluding "there is no constitutional prohibition against requiring parties" to "mak[e]. . . difficult judgments," such as whether to risk a lengthier detention by exercising their right to appeal); *id.* at 531 n.15 (considering the delay resulting from the alien's request for a continuance of his removal hearing so he could obtain relevant documents); *Doherty*, 943 F.2d at 211 (concluding that the alien's "litigation strategy [was] perfectly permissible," but he

25

could "not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process").

Hodge's Section 1226(c) detention has a "definite termination point:" either a final removal order or success on his CAT claim. *See Demore*, 538 U.S. at 529. Until one of those outcomes occurs, Hodge may obtain relief from detention by agreeing to release to the Dominican Republic. The Constitution does not require his release into the United States while removal proceedings play out.

Finally, even if some governmental deprivation—and some relevant and context-specific liberty rights—existed here, the amount of corresponding process that would be due to Hodge under the three-factor, "flexible," and "situation[al]" approach outlined in *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotation marks and citation omitted),[15] and discussed above, is the amount provided for by Congress. It does not include an extra-statutory bond hearing.[16]

---

[15] *See Galvez v. Lewis*, 56 F. Supp. 2d 637, 648–49 (E.D. Va. 1999) (concluding that "the government's interest outweigh[ed] that of Petitioner" because (1) the petitioner's "right to freedom pending removal [was] not absolute, especially in light of his illegal alien status and drug conviction" and the fact that he did not dispute his alien status or conviction, and (2) the government's interest was "substantial," given the "administrative burden of conducting . . . individualized bond hearings for each and every detained alien" and the risk of a released alien absconding); *see also Yanez*, 149 F. Supp. 2d at 493–94.

[16] Hodge's due process claim also fails under the test proposed in Justice Kennedy's *Demore* concurrence. The circumstances of his detention do not support an inference that his detention is arbitrary, unreasonable, or unjustified. *See Demore*, 538 U.S. at 532 (Kennedy, J., concurring). There are no facts suggesting that the government seeks to detain Hodge for "other reasons" beyond facilitating deportation or protecting against risk of flight or dangerousness. *See id.* at 532–33 (Kennedy, J., concurring).

In sum, Hodge's continued detention comports with his procedural due process rights.[17]  Moreover, there is no indication that his detention has become unjustified, unreasonable, or arbitrary—especially in light of his conviction, litigation regarding removal, and the absence of any apparent inaction or bad faith on the government's part.  Neither the Constitution nor binding case law requires a contrary outcome.

## CONCLUSION

For these reasons, the relief requested in Hodge's petition for a writ of habeas corpus is denied.  Because the Court has dismissed Hodge's claim, it also denies his request for costs and attorney's fees pursuant to 28 U.S.C. § 2412.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:      October 18, 2023
            Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

---

[17] Hodge does not allege a substantive due process claim. *See* Dkt. 8, at 21–22. Aliens "have a substantive due process right to be free of arbitrary confinement pending deportation proceedings." *Doherty*, 943 F.2d at 209; *see also United States v. Salerno*, 481 U.S. 739, 746 (1987) (substantive due process "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty") (internal quotation marks and citations omitted)).  Under the circumstances here, Hodge's detention is not arbitrary and does not result from government conduct that shocks the conscience so as to render his continued confinement a substantive due process violation.

27